Good morning and may it please the court my name is Melanie Morgan I represent David Lytle and I'd like to reserve three minutes for rebuttal. This is a sufficiency of the evidence case and I want to start with sort of a fundamental understanding and that is that direct marketing is not illegal. Advertising is not illegal. Selling sweeps reports is not illegal and operating sweepstakes is not illegal. Now there may be ways in which those become illegal but I want to start with that sort of fundamental premise and then jump right into what I think has been the huge part of the government's case and that is the direct mail pieces that were being used to promote the products to various consumers. Counsel can I ask you a threshold question about the theories of liability implicated by your sufficiency challenge. So there are a number of theories of liability and I'm not sure how or which your sufficiency challenge implicates and so that's my question is for you to kind of clarify that and the reason why is that the government contends that we can affirm the convictions on counts 2 through 20 on the co-conspirator liability theory if we affirm on count 1 and so I need some help around that. You didn't respond to that directly I don't think in your reply brief so I'd like you to speak to that Yeah and if I wasn't clear in my reply brief so I looked at it I came at this a little bit differently than the government did they said look just look at the conspiracy and if you can confirm on the conspiracy then really we don't need to look at everything else because of Pinkerton and I generally agree with that with that proposition and I'll give a caveat in just a minute about that but I don't think that you can make a decision about whether or not you think there is enough evidence on the conspiracy unless you actually look at all of the substantive counts and as to the substantive counts. Well counsel, counsel excuse me, don't you need an agreement in order to prove a conspiracy. You do need an agreement to prove a conspiracy. Where is the agreement in this case? Well I don't I don't think there is an agreement. Well if there's no agreement what happens to the balance of the case? I still think. I didn't see in your brief that you really took that or made that argument. I did not make that argument no. Why not? Candidly judge I ran out of space to make that this was a pretty convoluted situation because I felt like each one of these relationships with with these entities was a contractual relationship between Epsilon and the business and so you had to look at each of those because a scheme to defraud is essentially an agreement to You had to look at each of those and if you don't know. Is Epsilon the defendant in this case? Epsilon was never a defendant they were separately dealt with. And I'm interested in an agreement between your client and whoever the other conspirator or the company that did this supposed brawl. I'm happy to do. I'm happy to address that. I don't believe there is an agreement between my client and any of the customers. His agreement truly was with his employer and that was to sell data and it was to facilitate that sale of data by collecting information from these different entities getting their signature on a contract in which they agreed that they were how they were going to manage that data including complying with all laws guidelines regulations that might be applicable and then it went to the president of the company who would look at the promotional material look at the contract execute the contract and then it went to a separate part of Epsilon for the sale and the management of data. So I don't believe with any of these there's there was any kind of agreement and it when we look at each of the separate counts I grouped RDD as one because I think they can be addressed a little bit differently. But then all of these other individual ones there's there's very little contact other than my client being the facilitator of the paperwork. There's very little contact with my client with these various entities and there's certainly no there was no evidence of any kind of discussion that he had with them about what their business was other than for them to give the promotional material. And for Mr. Lytle to then circulate it. Well the records pretty clear that he knew he didn't need to talk to them to know what they were doing did he? So so all he needed was the information to say hey we want to buy it because it goes into a particular category they send the promotional material to them so he yes he had that. But I want to be clear that his his job was not to like when the government says review it he collected it he saw what it was and he forwarded it on. There was not an analysis to see if they were doing what they held out to do. Well he definitely had opinions on that. I mean the record would show that he looked at it and he had opinions about it and he even expressed those internally. Sure. And he and he did not necessarily deny that many of these customers were at least shady. So I I think we need to be careful about the use of the word shady because Fritz Kessler was. OK let's use let's use a different word. No I'm pushing right up to the line of outright fraud. Right. So but I think it's fair to say that when you say OK look I don't like this. Nothing I would nothing I would want to do nothing that I would want to buy doesn't mean that there is objective knowledge that somebody is engaged in fraud. I assume that there is not a single person in this courtroom that is going to that is interested in spending money on the sweeps report. I also think there's probably nobody in this courtroom that's interested in buying trinket jewelry. But that doesn't mean that there are not people that want that that are interested in who would like to have a report that says OK like I can fill out all of these things mail in my little card and I can enter in all of these sweepstakes and let's see what happens. I agree with all of that but it seems like we're talking about a little bit of willful blindness here where he's like tracking and for lack of a better term. I don't want to quibble over the word tracking but like he's he's he's cognizant of who's going to jail who's got their company set up to where one of them won't have to go to jail if they get busted. You know that kind of thing. I mean it's he's aware that this is that that they are doing business with people who are very close to the line at best at times.  And I and so that so that brings me to it. Oh go ahead. Go ahead. Let me ask one question. If a person sees a crime being committed, does that person have some kind of a duty to either stop it or report it? No. Thank you. Okay. So what did the record show in the proceeding below about legitimate business that this department conducted? Because I assume that not every one of their customers was engaging in fraud. This was just like the tiniest percentage that was that was engaging in this activity. And let me say when you say engaging in fraud, that's really part of my concern here is because of with the exception of RDD and Destiny Research Center, which had people who actually worked for those businesses who came in and said, yeah, it was a fraud. We said that we were, you know, going to give people a guaranteed payment. The guaranteed payment showed one dollar. But we decided not to do that and we didn't do it and we didn't send things out. So those people admitted to that. But the other folks, like all the other businesses for these, right, nobody ever came in and said, hey, yeah, this is what we were doing and this is what we intended to do. So are you saying that because there was no direct evidence as to the other customers, that's the end of the government's case? You have to satisfy the sufficiency challenge. No, I understand that. And yes, I am, because this was such an enormous component that I think once you realize that they never established a scheme to defraud with most of these, with most of these businesses, you're then left with focusing on, OK, let's talk about the two that they did establish it with. That would be RDD and DRC. And what was David's involvement with both of those? Well, with DRC, that was signed years before David came on board. With RDD, that was in 2013. David had just very recently been assigned that client from or this category of people from Fritz Kessler. And that was a first signer. But as to RDD, the person who testified, Sean Sullivan, the owner, he never had any contact with folks at Epsilon. Jill Castellano, who was the broker who brought it to David Lytle and said, hey, I've got this client, wants to buy some data. She never said David knew that there was any kind of misdeed. And so there just wasn't. I'm not sure why you're focusing. I don't understand your argument. You're focusing on RDD, which seems the strongest direct evidence. Yes, but the reason I'm focusing on them is because I think you get rid of everything else, right? I don't think that with any of these other entities. But I have to accept the fact because of the government's, you know, the light being looked at in the light most favorable to the government, that as to RDD, that the government did establish that there was a scheme to defraud. But that's why I focus on what did David know? And was there evidence that would show his knowledge? They didn't put any on to show his knowledge. Not only did they not do that, he denied having any knowledge that they were engaged in that. Is that my time left? That's your time left. So let's see if Judge Kelly has a question, and then if you want to reserve, I think it would be all right. Judge Kelly, do you have any questions right now? No, thank you. Okay. If you want to, go ahead and reserve. Can we put her back up to 330 since? Yeah. May it please the Court, Marissa Miller for the United States. This is kind of a complicated case, so I think it might be helpful to break it down by counts and looking at those counts, what Mr. Lytle did argue and did not argue. Counsel, counsel, before you break it all down, I want to know if Epsilon is a legitimate business. I believe Epsilon is a legitimate business. Okay. And the defendant here was employed by Epsilon. Is that correct? That's correct, Your Honor. And is it correct that the customers signed this master service agreement that specifically agreed the work would not violate any lower rule or regulation, et cetera? I believe that's also correct. All right. What is the where was the agreement with Mr. Lytle? Is that how you pronounce that? With either one of these, RDD or DRC, whatever you call them, where was the agreement that we're to face this conspiracy on? I recognize that Your Honor has concerns about the agreement, and I would like to address them. I'm sorry? I will address the agreement, but I do think it's important to recognize that the existence of an agreement is not something that was ever challenged in the opening brief or the reply brief. This is counsel, regardless of whether it's challenged or not. I want to know if there was an agreement with Lytle and any one of these other fraud feasors, if I could use that term. I mean, I don't believe there was a formal written agreement, but I believe that they all. Then I want to know where in the record it shows that there was any type of understanding that if I give you what you want, which are the addresses that you're going to use to defraud somebody. Where is that in the record? I apologize, Your Honor. I don't have a citation for that because this is the first time I'm hearing of this challenge, but I can submit a 27. The first time you're hearing about it, if you're the U.S. attorney, you must have known that you needed an agreement in order to prove a conspiracy. That's correct, Your Honor. I want to know what the basis of the conspiracy agreement is, for starters. I mean, I think it's the construction of the DTC unit here in Epsilon and all of the interactions between these direct mail clients and the key figures in this conspiracy. So then it's your position that an employee has got a duty to report or to stop any type of criminal undertaking that might come down the road. Your Honor, I think that's an interesting question. I think the way to think about it is how we would deal with this in the drug context, right? You can imagine someone who works at a garage and a drug dealer comes in and says, could you please create a special compartment in my car so I can bring these drugs across the border? He would just be doing his job in that case, but he has an obligation. And that's not really what we've got here. They sold addresses, and then you said that was legitimate. Yes. That's correct. But it's also against the law to… And so I want to know where the nexus is to connect this defendant to any fraudulent scheme and the addresses that were legitimate and were paid for by the client were used. How did that result in him being a conspirator? I think we have to recognize that the fact that Epsilon sold a legitimate product doesn't insulate it from criminal liability. Another analogy would be a company that manufactures a chemical compound. If that company opens a division that is designed to sell that chemical compound to meth dealers, those people are aiding and abetting the distribution of drugs. It doesn't matter that… But you didn't sue Epsilon. You didn't charge them as a company.  We charged the bad operators. Was it your position that if the janitor is an employee of that company that he would also be responsible? I think, Your Honor, that the answer to that would be no, because he would not have the intent required unless we're talking about a situation in which the janitor really wants the crime to succeed and his activities are in some way aiding, abetting, inducing, procuring the crime itself. Your position is then that a person has a legal duty to stop or report criminal activity. Our position is that it violates aiding and abetting if you are aware that the crime is occurring and you share the intent of the criminal doer and you assist them. Well, what do we do with the cases we have that say it's long established that a person has no legal duty to either stop or report a crime? Well, in this case, we're not tying liability to Mr. Lytle failing to stop or report the crime. We're tying it to affirmative actions. What did he do other than put, sell or deliver the addresses that had been ordered and which he said was a legitimate business? So the record shows that he's not just processing these samples. He is the one who's going out and recruiting the clients. So in the analogy, he is the one who works at the company is recruiting the meth dealers and he is deliberately choosing them. Now, this is not a meth dealer and don't try to get into the drug business. This is a legitimate company that sells names and addresses for various reasons. Isn't that correct? Yes, that's correct, Your Honor, but I think maybe the garage analogy would be more helpful. It doesn't matter. I don't think it's helpful at all unless you can show me how Mr. Lytle participated in the fraud of the company to which the addresses were sent. So Mr. Lytle. Without the fact that he may have looked at the paper and thought, gee, this is really not a very good deal. So the way Mr. Lytle participated in this fraud was as follows. He is the one who is going out and recruiting these clients and he has discretion over who to recruit. He's not just signing up people. He's the one who's going out and he is pursuing these accounts specifically. And I have record citations for you on that if you would like them. In addition. Wasn't that his job to try to develop a business and go out and find customers who wanted to buy addresses? Yes, but that doesn't enslave him from criminal liability. You're making a lot out of nothing. I worry that I'm not going to convince you on this, Judge Kelly. So perhaps I can speak to some of the other counts. Can I ask you a question about I don't remember what count it is. It's but the one that has to do with Mr. P. Sony. Yes. Is that right? On all of your other ones, there was a document that was provided to Mr. Lytle that he looked at and presumably your theory is he could look at it until it was a sham. And then he gives out the the addresses and names in furtherance of sending out the sham document in the P. Sony instance. There's we don't have that. All we know is we have testimony that maybe he was a bad actor. Maybe he had done criminal things in the past and that we were going to reach out to him. But other than that, we don't have anything because we don't just because we've never seen his mailer. So we can't know if the mailer that we were trying to solicit from him was going to be legit or not legit. So isn't that a distinction between the other counts that's problematic for you? I would agree. It's a distinction between the other counts. Count 11 is different. Our argument remains that this this is a co-conspirator liability count. And the conspiracy here obviously involved Mr. Lytle's efforts to recruit these people that he either knows or strongly suspects are engaging in behavior that's intended to to people out of their money. Right. But I guess the problem with that is we have a whole other book of business that you concede is legitimate business that. I mean, we would have to dig into the background of every one of the people he solicited in his tenure to determine whether he was conspiring to commit fraud with those people. I mean, I think this situation is a little bit different because Matt Pisoni is well known to him as someone who has violated the law. So. So I mean, he hasn't done anything. I mean, that's part of the the foundation of our country is that once you serve your time, you're not presumed to be breaking the law anymore. I will agree that the nexus there between the scheme to defraud is more tenuous. That's I can't dispute that. I'll take it. OK, I would argue that it's enough. Very quickly, back to the conspiracy charge. There are only two challenges, as I understand it. There was no challenge to the existence of an agreement. The only challenges were whether Mr. Lytle knew the essential objective of the conspiracy and whether he participated in. I'm happy to talk about that evidence, but I think that the upshot of count one is that if the court does choose to reject those challenges, it can affirm the others on the grounds of conspirator liability. Can you speak to that? I really want to make sure that you answer the question that I directed to the appellant as well, which is how we should be thinking about alternative theories of liability here and how those interface with the sufficiency challenge on the counts. I mean, I think that the argument in Hillman about alternative theories of liability is it's more of a waiver in a party presentation role than is anything. And that's if they don't make these arguments, we don't consider that challenge and we affirm on the ground they haven't defended. I do think there probably is some interplay between depending on if there are issues that this court believes that Mr. Lytle raised that I did not address. I can certainly see that interacting in a way that would not allow the court to uphold everything on the basis of conspiracy. Let me stop you for a minute. And then you can go on if you have more to say to Judge Rossman about that. But I just want to make sure I'm clear. So your basic position is, is they didn't challenge co-conspirator liability. Ergo, it's out. We don't consider it. Doesn't matter whether it's a good theory or not. That's correct. OK, fair enough. Go ahead. But just to follow up on that, I mean, your position is that every count other than if count one goes your way, every count can be affirmed as sufficient under a co-conspirator theory of liability. That is our position, yes. Every count to a count? I mean, it seems that some of them maybe would not be. I mean, I just I want to understand why every count goes that way. You know, it I recognize the tension that you're seeing there. And again, it goes back to what arguments the party has raised. And so if the court the court may be looking at this and saying, well, I don't think there's enough for co-conspirator liability here. But the problem is that Mr. Lytle did not raise that in his brief. And so we did not address that. We only address the issues that we had obligations to. And this court, you know, Mr. Lytle is represented by sophisticated counsel. These were arguments that he could have and should have probably raised. And the consequence of not raising those arguments is that the court can skip over them. OK, so if I understand the government's position is you're inviting us, a la Hillman, to sort of integrate the sufficiency challenge and the party presentation here. And that's how we get to affirmance on count one and affirmance on co-conspirator liability on the remainder. I think that is probably the if we're looking for the if you're asking me what the quickest path to affirmance is, which we're not looking for the quickest break. We're looking we're looking for the righteous path. Yes. But also the path that follows this course is precedence on when we address arguments that haven't been raised. But no, I mean, the court doesn't the court does have discretion to do to choose not to do that. And, you know, then again, I would I would at least point the court to the strongest counts, we believe, which are the ones involving RDD. Those are counts two, three and 14 through 20. Mr. Lytle has repeatedly conceded that there was a scheme to defraud underlying all of those counts. The only issue that the court has to address on those counts is whether he had knowledge of the scheme to defraud. And I think given the ample evidence in the record that was presented to that effect, that that would be the it would that the evidence met the sufficiency standard there. And I understand you're saying two, three, 14 through 20. Could you speak to the counts like that involved clients like Diamond Dollars and where there was no evidence that anyone was deceived? Well, if I may continue. Go ahead. A scheme to defraud doesn't require successful deception. And all we're really looking at is intent. And I do think that circumstantial evidence. Such as these flyers themselves can be sufficient to demonstrate intent to deceive. We can imagine, you know, a similar flyer that says come to the 10th Circuit. We're getting out 500 free sports cars. Asterisk. While supplies last, there are no supplies. You know, I would feel pretty confident looking at that document and saying the intention there was to trick people into showing up at the 10th Circuit without asking whether someone was actually deceived or whether the person who sent that out intended anyone to be deceived. Okay. Thank you, Counselor. You're out of time. We have three and a half minutes. Going back to Judge Rossman's question and I think concern about how this court should be addressing this. We address the conspiracy and challenge the sufficiency of the evidence on it. While we were focusing on, you know, the scheme to defraud and knowledge aspect of it, we were looking at it from an over, you know, you look at it from an overall challenge of that. And when you consider all of the other counts as sort of like the basis for this is how we have a conspiracy, I think it's very difficult. I also want to point out to the court when you look at under Pinkerton theory, they charged count one and they only focused on RDD, BDK, and DRC. None of us have really talked about BDK in this. DRC, we talked about that was signed before David came on board. And then that just leaves us with RDD. But all of these other counts aren't actually identified specifically. And the government declined to identify those specifically when we made that request pretrial. So I want to point that out to the court because when you look at Pinkerton, Pinkerton talks about sort of this idea of like overt acts in a conspiracy. And then the substantive counts are actually those overt acts. We don't have that same kind of interplay here. And so I think when you're looking at, okay, what actually happened here? And can we somehow infer that there was, you know, like this agreement and this intent and all this? That's why I focus this the way I did on all of these other components of it, because I don't think that the evidence exists on any of those other ones, including Lifetree, as the court was talking about previously. And so then we're left with RDD. And my point continues to be the evidence was not sufficient to establish that he had knowledge. If he didn't have knowledge about all of these separate individual transactions from a legitimate company that was doing billion-dollar business with companies like Fabletics and Champion Windows and all kinds of solar and stuff, like the list was long. And there's an exhibit that talks about all of the other all of the other products that Mr. Lytle was selling. I just don't know how we get to a point that there is that there's a conspiracy, that somehow we can use that to support the notion that he's responsible for this conduct. And unless the court has more questions, I'll leave it at that. Thank you, counsel. Thank you. The case is submitted and counsel are excused. We'll call the next case. Looks like Ms. Miller gets to remain seated. 24-1411 United States.